NO. 24-10310-HH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*
v.

ALBERICO CRESPO,
*Defendant/Appellant.*

———————————

On Appeal from the United States District Court
For the Southern District of Florida
L.T. Case No. 1:21-cr-20005-DPG-1

———————————

APPELLANT'S REVISED INITIAL BRIEF

———————————

| BHAKTI KADIWAR, ESQ. | PHILIP L. REIZENSTEIN, ESQ. |
|---|---|
| REIZENSTEIN & ASSOCIATES, PA | REIZENSTEIN & ASSOCIATES, PA |
| 2828 CORAL WAY | 2828 CORAL WAY |
| SUITE 540 | SUITE 540 |
| MIAMI, FL 33145 | MIAMI, FL 33145 |
| FLA. BAR NO: 117518 | FLA. BAR NO: 634026 |
| (305) 444-0755 | (305) 444-0755 |
| BHAKTI@REIZENSTEINLAW.COM | PHIL@REIZENSTEINLAW.COM |

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

1.  A.A.

2.  Altman, Hon. Roy

3.  Alfonso, III, Armando Roberto

4.  Altonaga, Alyssa Maria

5.  Becerra, Hon. Jacqueline

6.  B.R.

7.  Cabrera, Roger De Jesus

8.  Clark, Christopher

9.  Crespo, Alberico

10. Diaz Gutierrez, Jorge

11. Donate Medical Center

12. Dunham, Christian Scott

13. Fajardo Orshan, Ariana

14. Fleischer Louis, Lauren

15. Gayles, Hon. Darrin P.

16. Gonzalez, Juan Antonio

17. Gonzalez Garcia, Rodolfo

18. Goodman, Hon. Jonathan

19. Grosnoff, Nicole

20. L.A.

21. Lapointe, Markenzy

22. Litwin, Ashley Michelle

23. Lorenzo, Anais

24. Matzkin, Daniel

25. M.C.

26. McAliley, Hon. Chris

27. McLaughlin, Sean Thomas

28. Meadows, Christopher

29. M.P.

30. O'Sullivan, Hon. John J.

31. Otazo-Reyes, Hon. Alicia M.

32. P.R.

33. Padilla, Joaquin E.

34. Quinon, Jose

35. Rabin, Jr. Samuel Johnson

36. Reid, Hon. Lisette

37. Reizenstein, Philip L.

38. Seitles, Marc David

39. Senior, Robert K.

40. Silverstein, Joan

41. Torres, Hon. Edwin G.

42. Trujillo Hernandez, Yandre

43. West Medical and Pain Management Clinic #1

## STATEMENT REGARDING ORAL ARGUMENT

This case presents factual applications of case law on issues. Oral argument will assist the Court in resolving any factual questions regarding the application of the facts to the law.

## <u>TABLE OF CONTENTS</u>

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT** ...............................................................................I

**STATEMENT REGARDING ORAL ARGUMENT** ......................................IV

**TABLE OF CITATIONS** .................................................................... VII

**STATEMENT OF JURISDICTION** .................................................... 1

**STATEMENT REGARDING TYPE STYLE AND SIZE** ...............................IX

**STATEMENT REGARDING RECORD CITATIONS**..................................IX

**STATEMENT OF THE ISSUES** .......................................................... 1

**STATEMENT OF THE CASE** ........................................................... 1

**SUMMARY OF THE ARGUMENT** .................................................. 11

**ARGUMENT**.................................................................................. 13

**I.    THE DISTRICT COURT ERRED BY DENYING THE MOTION TO SUPPRESS TITLE III WIRE COMMUNICATIONS AND REQUEST FOR *FRANKS* HEARING AS UNTIMELY; CRESPO DEMONSTRATED GOOD CAUSE FOR THE MOTION TO SUPPRESS TO BE FILED AFTER THE LOCAL RULE DEADLINE FOR PRETRIAL MOTIONS** ......................... 13**

**II.   THE DISTRICT COURT ERRED BY DENYING THE MOTION FOR MISTRIAL AFTER IMPROPER TESTIMONY PLACING CRESPO WITH DIAZ WHEN DIAZ WAS CONDUCTING OXYCODONE TRAFFICKING AND CAUSING INCURABLE HARM; THE COURT ALSO ERRED BY DENYING MISTRIAL AFTER PROSECUTOR'S BAD FAITH QUESTION IMPLYING THAT CRESPO WAS TOLD BY DIAZ THAT THE**

BENEFICIARIES WHO WERE GOING TO BE QUESTIONED HAD
COVID ................................................................................. 22

III.    THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT
ALLOWING RECROSS EXAMINATION OF AGENT SLATTERY ........ 28

IV.    THE COURT ERRED BY IMPROPERLY ADMITTING RULE
404(B) EVIDENCE OF UNCHARGED ACTS: THE COURT ERRED BY
ALLOWING PREJUDICIAL TESTIMONY BY SLATTERY ABOUT
CRESPO'S VIOLATION OF HHS-OIG POLICY BY SELLING PPE FOR
COVID ................................................................................. 29

V.    CUMULATIVE EFFECT OF ERRORS IN THE DISTRICT COURT
WARRANTS REVERSAL AND NEW TRIAL ............................. 32

VI.    THE DISTRICT COURT ERRED BY DENYING THE MOTION FOR
JUDGMENT OF ACQUITTAL .................................................. 37

VII.    THE DISTRICT COURT'S REFUSAL TO GIVE A GOOD FAITH
DEFENSE JURY INSTRUCTION WAS AN ABUSE OF DISCRETION AND
REVERSIBLE ERROR ............................................................ 46

VIII. THE COURT ERRED IN SENTENCING ......................... 53

CERTIFICATE OF COMPLIANCE ................................................ 56

CERTIFICATE OF SERVICE ...................................................... 56

## TABLE OF CITATIONS

**Cases**

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).....................38, 49, 51

*Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978)............................ passim

*United States v. Aguilar*, 515 U.S. 593, 115 S. Ct. 2357, 132 L. Ed. 2d 520 (1995) ........................................................................................................42, 43, 51

*United States v. Andres*, 960 F.3d 1310 (11th Cir. 2020)......................................14

*United States v. Balotin*, 3:19-cr-191-MMH-JBT (M.D. Fla. Feb. 28, 2023)........46

*United States v. Barsoum*, 763 F.3d 1321 (11th Cir. 2014).................................16

*United States v. Bradberry*, 466 F.3d 1249 (11th Cir. 2006) ..............................33

*United States v. Burke*, 738 F.2d 1225 (11th Cir. 1984) .....................................28

*United States v. Diaz-Lizaraza*, 981 F.2d 1216 (11th Cir. 1993) .......................31

*United States v. Dorsey*, 819 F.2d 1055 (11th Cir. 1987) .............................31, 32

*United States v. Fernetus*, 838 Fed. Appx. 426 (11th Cir. 2020) .......................15

*United States v. Fey*, 89 F.4th 903 (11th Cir. 2023).......................................25, 26

*United States v. Friske*, 640 F.3d 1288 (11th Cir. 2011)...............................42, 43

*United States v. Gatlin*, 90 F.4th 1050 (11th Cir. 2024) ....................................37

*United States v. Guzman*, 167 F.3d 1350 (11th Cir. 1999)..................................27

*United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999) ...................................33

*United States v. Harris*, 20 F. 3d 445 (11th Cir. 1994) ......................................37

*United States v. Harriston*, 329 F.3d 779 (11th Cir. 2003) .......................22, 24, 25

*United States v. Hesser*, 800 F.3d 1310 (11th Cir. 2015)....................................33

*United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir. 1992)..........................34

*United States v. Lewis*, 40 F.4th 1229 (11th Cir. 2022) ......................................29

*United States v. Lopez*, 590 F.3d 1238 (11th Cir. 2009) .....................................46

*United States v. McClintock*, No. 18-12916 (11th Cir. Apr. 24, 2019)...........27, 36

*United States v. Moise*, 21-13424, 2022 WL 16579945 (11th Cir. Nov. 1, 2022). 25

*United States v. Moran*, 778 F.3d 942 (11th Cir. 2015)......................................55

*United States v. Morris*, 20 F.3d 1111 (11th Cir. 1994)................................46, 50

*United States v. Ramirez*, 426 F.3d 1344 (11th Cir. 2005)..................................33

*United States v. Riley*, 995 F.3d 1272 (11th Cir. 2021)......................................53

*United States v. Sanders*, 668 F.3d 1298 (11th Cir. 2012) .................................32

*United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195 (11th Cir. 2009). .........46

*United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999).....................................44

*United States v. Valdez*, 2023 WL 355091 (11th Cir. Jan. 23, 2023) ..................29

*United States v. Vazquez*, 21-12061, 2023 WL 2661575 (11th Cir. Mar. 28, 2023), *cert. denied,* 23-7486, 2024 WL 2883877 (U.S. June 10, 2024)..13, 14, 16

*United States v. Vazquez*, 406 Fed. Appx. 430 (11th Cir. 2010) ..........................13

**Statutes**

18 U.S.C.A. § 1512 (2008)............................................................................ passim

**Other Authorities**

U.S.S.G. 1B1.3............................................................................... 53, 54

**Rules**

Rule 12, Fed. R. Crim. P. ............................................................... 13
Rule 404(b), Fed. R. Evid. ................................................1, 12, 29, 30

## STATEMENT OF JURISDICTION

This appeal is taken from the final judgment of the United States District Court for the Southern District of Florida entered on January 25, 2024. [DE 319]. The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231, which grants original jurisdiction to the district courts over all offenses against the laws of the United States. The United States Court of Appeals for the Eleventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which provides the courts of appeals with jurisdiction over appeals from all final decisions of the district courts of the United States. The notice of appeal was timely filed on January 30, 2024 [DE 323], in accordance with Rule 4(b) of the Federal Rules of Appellate Procedure.

## STATEMENT REGARDING TYPE STYLE AND SIZE

The type style used in this brief is Times New Roman and the type size is 14 points. The footnotes are in Times New Roman, and the type size is 12 points.

## STATEMENT REGARDING RECORD CITATIONS

All documents in the Appendix, including the transcript of the trial and the sentencing hearing, will be referenced by the record docket entry ("DE") followed by the entry number on the docket, and then the page number [*e.g.,* (DE 131: 100)]. The page number in the transcript is the page number assigned by the court reporter.

## STATEMENT OF THE ISSUES

I.     Whether the district court erred by denying the Motion to Suppress Title III Wire Communications and request for *Franks*[1] Hearing as untimely

II.    Whether the district court erred by denying a mistrial after improper testimony and prosecutorial misconduct

III.   Whether the district court abused its discretion by denying re-cross examination of government witness Agent Sean Slattery

IV.    Whether the district court erred by improperly admitting Rule 404(b), Fed. R. Evid. evidence of Personal Protective Equipment (PPE) sales

V.     Whether the cumulative effect of errors warrants a reversal and new trial

VI.    Whether the district court erred by denying the motion for judgment of acquittal

VII.   Whether the district court abused its discretion by denying defense jury instructions

VIII.  Whether the district court abused its discretion in sentencing

## STATEMENT OF THE CASE

Jorge Diaz, the government's star witness, speaks with dead people. [DE 348: 15- 20]. Despite that, Al Crespo was convicted on his word.

On January 6, 2021, Alberico Crespo, a federal law enforcement officer, was charged by Indictment with Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance (Count 1), Conspiracy to Commit Witness

---

[1] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978).

1

Tampering (Count 5), Witness Tampering (Counts 7-9), and Conspiracy to Obstruct Justice (Count 10). [DE 46].

On October 10, 2022, Crespo filed a Motion to Suppress Title III Wire Communications and Request for *Franks* Hearing. [DE 182]. The district court denied the motion and motion for reconsideration as untimely.  [DE 184].

Crespo was acquitted of Count One and convicted of the remaining counts. On January 24, 2024, Crespo was sentenced to 97 months in prison. [DE 319]. Crespo is currently incarcerated.

"Al" Crespo has dedicated his life to serving the United States in the Airforce, on drug interdiction operations in Colombia, and in the Central Command. [DE 182: 2]. Crespo served as a police officer with the Hialeah Police Department from 1997 to 2006 [DE 338: 49] and was promoted to detective assigned to the gang, narcotics, and the career criminal units. [DE 182: 2]. Crespo then became a DEA agent working undercover targeting the most infamous drug cartels and endangering his life. [DE 182:3; DE 338: 17].

From 2010, until the time of his arrest, Crespo served as a federal agent for the Office of Inspector General, U.S. Department of Health and Human Services ("HHS-OIG") working with the Southern District of Florida Healthcare Fraud Strike Force. [DE 338: 13].

In 2016, Crespo met Jorge Diaz Gutierrez ("Diaz"). [DE 338: 18]. They both practiced the Santeria religion.  [DE 338: 19]. Diaz is comparable to a high priest [DE 338: 19; DE 343: 112], and Crespo treated him with reverence and called him "father". [DE 338: 19; 32]. Unbeknownst to Crespo, Diaz was buying and selling Oxycodone with the help of a number of doctors [DE 338: 20], including Dr. Rodolfo Gonzalez ("Dr. Gonzalez").

Diaz took advantage of Crespo's position, telling buyers that he was protected by his "son" the federal agent. [DE 338: 21]. Around March 19, 2019, an investigation began into Crespo's relationship with Diaz [DE 338: 22], which ultimately led to Crespo's arrest.

**Trial Testimony**

The government's first witness was FBI agent Sean Slattery [DE: 338: 33], lead agent in the investigation during 2019 to 2020. [DE: 338: 36; 41]. The public corruption squad investigation into Crespo began in April 2019 with a concurrent Strike Force investigation. [DE 338: 113; 115]. Physical, aerial, and pole camera surveillance was conducted on Crespo and his house. [DE 338: 115;120].

Phone records were obtained for Crespo's personal and government phones [DE 338: 124] and Diaz's phones [DE 338: 125]. Three wiretap periods ran from 1) April 17 to May 16, 2020; 2) May 30 to June 29, 2020 and 3) July 6 up to the date of arrest, July 21, 2020. [DE 338: 132; 134-35; 146-47].

The number of calls that had arguably prejudicial and evidentiary value was small. On July 17, 2020, Crespo was at Cooper's Hawk [DE 338: 182] in Doral, drinking with Henry Luna, another federal agent. [DE 338: 178-80]. They were there from 2:08 p.m to 6:40 p.m. [DE 338: 183-84]. Five bottles of wine were purchased. [DE 338: 185].

In a phone call at 7:04 p.m., Crespo, who had been drinking, was recorded as stating "look, old man, I grab Anais, I grab her in a canal, I stick her in, I stick her in a bag, they will never find her again." [DE 288: Exh. 07-64: 5; DE 338: 172]. Slattery testified that Crespo was wrong when he told Diaz that Anais Lorenzo ("Lorenzo") was cooperating.  [DE 338: 193].  Diaz, when he began cooperating, told Slattery that Crespo sounded intoxicated on the call. [DE 338:187].

HHS-OIG agent Rolando Alvarez testified. [DE 340: 5]. He was on the same squad with Crespo [DE 340: 19]. Alvarez participated in the investigation that led to the indictment of Dr. Gonzalez. [DE 340: 20]. Dr. Gonzalez used to work at East Medical cited in a different indictment – the Bosch Indictment. [DE 340: 33]. Dr. Gonzalez ultimately pled guilty. [DE 340: 34].

Over defense objection, Alvarez testified that his FBI Counterpart – Agent Charles Lawless – asked Alvarez for help interviewing a witness, Ruben Sotolongo [DE 340: 101] involving the Gonzalez case. [DE 340: 100]. Over defense objection citing the Confrontation Clause [DE 340: 101], Alvarez testified that Sotolongo

made incriminating comments about Crespo, and Alvarez stopped the interview and reported it to his HHS-OIG chain of command, Jesus Barranco. [DE 340: 100-101].

Alvarez testified that on October 2, 2019, Crespo called Alvarez [DE 340: 103] and told him Jorge Diaz was his friend [DE 182: 24], and that two agents wanted to interview Diaz. [DE 340: 105]. Despite Crespo's disclosure, in their April 2020 Title III Warrant Application, the government claimed that Crespo had never told HHS-OIG about his relationship with Diaz. [DE 182: 24-5]. Alvarez told Crespo that he was no longer working Gonzalez's case and that he thought they were almost done on that case [DE 340: 106] and that he probably told Crespo that the investigation was closed on the October 2, 2019 phone call, as he had stated in his March 2020 FBI interview. [DE 340: 121].

FBI Special Agent Charles Lawless, member of the SDFL Healthcare Fraud Strike Force from 2016 to 2020, testified next. [DE 340: 142-3].

Lawless testified that he had "prior information" that Crespo was with Diaz when he was buying and selling Oxycodone. [DE 342: 8]. Crespo's defense counsel objected and moved for a mistrial. [DE 342: 9]. On cross examination, Lawless testified that Crespo was recorded on the calls repeatedly telling Jorge Diaz to call Lawless. [DE 342: 36][DE 288: Exh. 7-55].

Special Agent Sean Slattery testified again. Over objection to the prejudicial nature of the testimony about irrelevant and uncharged conduct [DE 342: 86], the

prosecutor questioned Slattery about e-mails in which Crespo appears to be buying and selling PPE for COVID protection without approval from HHS-OIG. [DE 342: 84-85].

On cross examination, Slattery testified that the January 25, 2019 e-mail in which Agent Alvarez asked for help with the Dr. Gonzalez arrest did not identify the name of the doctor. [DE 343: 10; DE 288: Exh. 17C]. Nor did Alvarez's February 7 e-mail request for assistance in a search warrant identify the name of the clinic. [DE 343: 11; DE 288: Exh. 17C]. Although Crespo responded he would be available, he did not participate in the arrest or search warrant. [DE 343: 12]. These instances demonstrate the misleading nature of the Title III Warrant Application and the source of the wiretap evidence, without which the government would have no direct evidence.

Crespo's office was three minutes from Dr. Gonzalez's clinic. There was no evidence that Crespo went to Gonzalez's clinic. [DE 343: 15-16].  On October 2, 2019, Crespo told Agent Alvarez that he found out that Alvarez was the agent handling the case. [DE 343: 10]. Crespo told Alvarez he knew Jorge Diaz, that he was entering the IRIS system, and that he was calling Alvarez on behalf of Jorge. [DE 343: 17-18]. There was no evidence that Crespo made further relevant IRIS searches after October 2, 2019. [DE 343: 20-21].

The prosecution's next witness was Anais Lorenzo. [DE 343: 27]. Lorenzo was Jorge Diaz's girlfriend from 2011 to 2019. [DE 343: 30; 109]. She pled guilty in 2022 to conspiracy of possession and intent to distribute Oxycodone. [DE 343: 42].

Lorenzo testified that Diaz was a manipulator. [DE 343: 33; 50; 109; 110; 117; 119; 124]. As a high priest in Santeria – a *Palero* [DE 343: 114] – he would pass spirits, changing "the way he talked, the way he was acting," while he was in contact with "a spirit that went through his body." [DE 343: 113].

Lorenzo testified Crespo had a father-son relationship with Diaz; Diaz was Crespo's religious guide. [DE 343: 114]. Lorenzo testified that Diaz was able to manipulate her and others to serve his purposes. [DE 343: 116].

Jorge Diaz testified next. Diaz met Crespo around 2016 [DE 343: 137], their relationship developed because of Santeria [DE 343: 140]. He lived in the efficiency separated by doors from Crespo's residence for eight months prior to his arrest. [DE 343: 152].

Diaz pled guilty in July 2022. [DE 343: 161; 163]. Diaz testified he recruited patients and was involved with oxycodone trafficking with Drs. Espinosa, Gonzalez, and Carpman. [DE 344: 18]. He testified that he found out through Crespo that he was not going to be arrested during the Dr. Gonzalez indictment. [DE 344: 45].

Diaz testified that when he was buying and selling pills Crespo wasn't with him. [DE 344: 51]. Diaz testified much information about the investigation came from deductions and gossip with patients rather than knowledge from Crespo. [DE 344: 53]. Diaz testified that his belief that Gonzalez was cooperating was Diaz's own deduction. [DE 344: 55]. When asked how he knew that the people who arrested Dr. Gonzalez were federal agents, Diaz testified "That's what people were saying…We, the patients", not Crespo. [DE 344: 58]. When asked whether he had conversations with Crespo about Dr. Gonzalez, Diaz testified that "Yes, I told him that I had found out that they had Gonzalez." [DE 344: 59].

On May 8, 2020, Diaz dialed Anais Lorenzo and gave Crespo the phone after she threatened Diaz; Crespo left an angry voicemail. [DE 288: Exh. 7-17, p. 68][DE 344: 90]. Diaz testified that in June 2020 Crespo told him to call the FBI agent. [DE 347: 14].  Diaz testified was trying to make his patients and buyers feel at ease by using Crespo as his protection. [DE 347: 25].

Regarding the July 17, 2020 call constituting Count 8, Diaz testified that Crespo told Diaz that no one is listening to his phone or Diaz's phone. [DE 347: 67] [DE 288: Exh. 7-54, p. 220]. Crespo was obviously wrong and didn't have insider information like he claimed. The evidence showed that Crespo was all words and little action, which is not a crime.

Diaz testified that Crespo told him to lie to the FBI agent. [DE 347:75; 77].

On cross examination, Diaz testified that his spirit – a dead person [DE 348: 20] – would set a fee of $121.21 to rid people of dark spirits. [DE 348: 15]. He would charge $2,000 to $2,500 to make people saints. [DE 348: 25].

Diaz agreed that Crespo showed tremendous deference to Diaz. [DE 348: 25-26]. Diaz testified that Crespo was not in the Oxycodone business with him and would not get any of the thirteen to fourteen thousand dollars that Diaz made monthly. [DE 348: 34].

Diaz testified that on October 2, 2019, Crespo called the agent on the Gonzalez case in front of him, who told Crespo he was closing the case because he was tired of it. [DE 348: 51].

On July 17, 2020, Crespo and Diaz spoke on the phone eight times [DE 348: 64], and Crespo sounded drunk. [DE 348: 65]. The first relevant conversation took place at 4:27 p.m., by which time Crespo had been drinking five to six bottles of wine for four-and-a-half hours with Henry Luna. [DE 349: 42; 60].  Crespo stated he would kill both informant Carlos Pozo and Anais [DE 348: 64], but Diaz testified that "as far as I know, that's something that he wouldn't do" and that "he wouldn't be capable of doing that." [DE 348: 65].

The prosecution called Jesus Barranco, Assistant Special Agent in Charge with HHS-OIG. [DE 348: 69]. Barranco had a supervisory role over Crespo and

Rolando Alvarez. [DE 348: 76]. He testified that Crespo was a "very productive" and "well-respected" agent. [DE 348: 75].

On March 2, 2019, Crespo accessed the Gonzalez case file. [DE 348: 95] [DE 288: Exh. 10E]. Barranco testified that while on vacation, Crespo acted as supervisor and was responsible for reviewing and approving case reports, with system adjustments made to grant him access. [DE 348: 153].

The government rested. The court denied the defense Rule 29 motion and the renewal of all other motions. [DE 348: 23-30].

The defense put on a case. HHS-OIG federal agent Henry Luna testified. [DE 349: 32]. Luna testified that the pandemic resulted in much work taking place over the phone and online. Luna testified about while he was with Crespo at Cooper Hawk's when Crespo was drunk and recorded making a phone call involving threats. They drank between five and six bottles of wine [DE 349: 42]; Luna noticed that Crespo was intoxicated.  [DE 349: 42, 60].

The defense rested and Crespo's counsel renewed all pretrial motions and all motions made during trial and moved for dismissal of all counts pursuant to Rule 29. The court denied the motion. [DE 349: 90]. During the jury instruction charge conference, the court overruled defense objections [DE 349: 108-109] and the good faith defense instruction. [DE 349: 111; 114].

In closing, the government referred to "Crespo's lies" [DE 349: 144] and repeatedly called him a "corrupt agent." [DE 349: 153; 155; 157; 160; 162; 164; 185; 237].   The prosecutor speculated that phone calls that took place on the day of a squad meeting in December 2018, six weeks before Gonzalez DTO arrests, between Crespo and Diaz, were about whether Diaz was going to be charged [DE 349: 153] and made other guesses about what went on during phone calls between Diaz and Crespo while the Gonzalez DTO investigation was ramping up. [DE 349: 154]. This was improper and unsupported by evidence.

The jury acquitted Crespo of Count One, Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, and convicted him of the remaining counts. [DE 319].

At sentencing, defense counsel objected to the Presentence Report that the base offense level include the entire Gonzalez conspiracy and argued that only a portion should be considered in calculating guidelines; the defense objection was overruled. [DE 335: 8-13].

## SUMMARY OF THE ARGUMENT

I.    The district court abused its discretion by denying Crespo's Motion to Suppress Title III Wire Communications as untimely. Crespo demonstrated good cause for the delay.  Relevant discovery to the Title III was not disclosed until well

after the pretrial motion deadline. The merits of the Motion further establish good cause, and its denial prevented Crespo from challenging the wiretaps on constitutional grounds.

II.     The district court erred by denying a mistrial after allowing improper testimony and prosecutorial misconduct. FBI Agent Lawless's testimony that Crespo was present during drug transactions was unsupported by evidence. The prosecutor's bad faith question implying that Crespo was informed by Diaz that beneficiaries had COVID lacked foundation and prejudiced Crespo's substantial rights.

III.    The district court abused its discretion by not allowing recross-examination of HHS-OIG Agent Slattery, which violated Crespo's right to confrontation. The court's decision prevented Crespo from challenging critical testimony that implicated him in "tipping off" Jorge Diaz about the investigation,

IV.     The district court erred by admitting Rule 404(b) evidence about Crespo's alleged violation HHS-OIG policy by selling PPE during the COVID pandemic.

V.      The cumulative effect of errors, including the improper admission of evidence and prosecutorial misconduct, denied Crespo a fair trial.

VI.     The district court erred in denying Crespo's motion for judgment of acquittal.

VII.   The district court erred by refusing to give a jury instruction on Crespo's good faith defense, which was crucial to the theory of the defense.

VIII.  The district court erred in sentencing, using an improper calculation of drug quantities attributed to Crespo based on uncharged conduct related to a separate conspiracy.

## ARGUMENT

I.   **THE DISTRICT COURT ERRED BY DENYING THE MOTION TO SUPPRESS TITLE III WIRE COMMUNICATIONS AND REQUEST FOR *FRANKS* HEARING AS UNTIMELY; CRESPO DEMONSTRATED GOOD CAUSE FOR THE MOTION TO SUPPRESS TO BE FILED AFTER THE LOCAL RULE DEADLINE FOR PRETRIAL MOTIONS**

In a criminal case, where constitutional rights are at stake, the district court chose form over substance.

A district court's denial of a motion as untimely is reviewed for abuse of discretion. *United States v. Vazquez*, 406 Fed. Appx. 430, 431 (11th Cir. 2010).

### A.   **CRESPO DEMONSTRATED GOOD CAUSE FOR THE UNTIMELY FILING**

Rule 12(c)(2), Fed. R. Crim. P. allows the court to extend or reset the deadline for pretrial motions at any time before trial. "If a party does not meet the deadline

for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3); *United States v. Vazquez*, 21-12061, 2023 WL 2661575, at *2 (11th Cir. Mar. 28, 2023).

The district court denied Crespo's Motion to Suppress "*because his motion was untimely*". [DE 184]. The court cited Local Rule 88.9 requiring motions to be filed within twenty-eight days of the arraignment. The court stated that "As the wire communications at issue occurred pre-arraignment and they were disclosed to Defendant early in this case, Defendant's Motion is untimely and must be denied." [DE 184]. As will be seen, the court's ruling was a classic "Catch-22". The discovery on the Title III was not provided until long after the motions deadline. .

This Court has ruled that "[b]ecause [the appellant] failed to establish good cause sufficient to overcome the untimely filing of his motion to suppress, we find that the district court did not abuse its discretion in denying the motion as untimely." *United States v. Andres*, 960 F.3d 1310, 1316 (11th Cir. 2020).

It follows that **where the appellant does establish good cause, a court abuses its discretion in denying a motion to suppress and request for *Franks* hearing as untimely, especially where the evidence challenged was disclosed after the time period for motions had elapsed**.

14

Crespo established good cause. The parties filed stipulations and motions to continue the trial [DE 78, 88, 90, 99, 116, 144, 186] but neglected to include a stipulation to continue pretrial motion deadlines. [DE 185].

Crespo argued in his Motion for Reconsideration that 1) due to neglect of both parties, the pretrial deadlines were not extended at the same time as the later trial continuances were stipulated to and 2) CS-2's FBI incident summary, closed July 25, 2018, was provided to Crespo's attorney *over a year after the pretrial motion deadline passed in February 2021.* [DE 185: 2]. The information in the July 25, 2018 report was referenced by the government in its Title III application, so the government knew it existed and was in possession of it, but did not produce it until July 2022. [DE 185: 2]. The report was "arguably the main source in this case that was relied on by the Government extensively in the first wiretap application" [DE 185: 2]. The government's delayed production of key evidence was good cause and further undermined the court's reasoning in denying the motion that the Title III documents were provided "early". It was discovery provided later in the case that allowed Crespo to move to suppress the wires.

In *United States v. Fernetus*, 838 Fed. Appx. 426, 432–33 (11th Cir. 2020), the Court found that where appellant "had all the information necessary to file his motion to suppress before the court's deadline, and he failed to do so" the district court acted within its discretion in denying his motion on timeliness grounds. In

contrast, Crespo did not have all the information he needed to file his motion to suppress before the court's deadline.

Defense counsel argued that good cause existed to continue the motion deadlines because Crespo's Motion to Suppress was rooted in a constitutional issue [DE 185]; still, the motion was denied. This constitutes a clear error of judgment and abuse of discretion requiring reversal.

### B. THE MERITS OF THE MOTION TO SUPPRESS DEMONSTRATE THE CONSEQUENCES OF DENYING CRESPO THE RIGHT TO CHALLENGE EVIDENCE BASED ON PROCEDURAL RULES

#### 1. The application and affidavit did not support a finding of probable cause; a *Franks* hearing was warranted

The merits of the Motion to Suppress and Request for *Franks* hearing [DE 182], which the trial court did not consider, established good cause sufficient to overcome the untimely filing.

> A *Franks* hearing is warranted where a defendant "makes a substantial preliminary showing" that an affiant made intentionally false or recklessly misleading statements (or omissions), and those statements are "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674.

*United States v. Barsoum*, 763 F.3d 1321, 1328-29 (11th Cir. 2014).

In *United States v. Vazquez*, 406 Fed. Appx. 430, 431 (11th Cir. 2010), the Court found that the appellant "did not specifically challenge the affidavit

underlying the arrest warrant until his post-suppression-hearing brief, and because he did not present any evidence that the alleged false statements were made knowingly, intelligently, or with reckless disregard for the truth, we conclude that Vazquez failed to make the 'substantial preliminary showing' necessary for a *Franks* hearing."

The opposite is true here: 1) Crespo specifically challenged the affidavit pre-trial, 2) Crespo presented extensive evidence that the alleged false statements were made knowingly, intelligently, or with reckless disregard for the truth, and thus, Crespo made a "substantial preliminary showing" necessary for a *Franks* hearing. [DE 182: 22].

As discussed in Crespo's Motion to Suppress [DE 182], when the government submitted its first application for wiretap, it knew that the Gonzalez investigation had been closed, the Gonzalez DTO had been dismantled, and it did not intend to arrest Diaz, Lorenzo, and Rodriguez. However, the government knew it lacked probable cause for a wiretap application against Crespo, the true target of its investigation. The government did not inform the Magistrate Judge of the closed investigation and that it did not intend to arrest the three individuals identified in the application. The government bootstrapped a closed investigation into a warrant application to obtain wiretaps for Crespo it could not otherwise obtain judicial permission for. The government made it seem in the warrant application as if it were

still investigating the Gonzalez DTO and intentionally included half-truths, omissions, and falsehoods about Crespo. This is precisely why courts hold *Franks* hearings. The government did not need a wiretap to investigate the Gonzalez DTO, which it knew had already been dismantled.

The following are examples of misrepresentations made in first April 2020 Title III Application for Wiretap:

- Misrepresentation: Application identifies targets Diaz, Crespo, Lorenzo, and Rodriguez, with Diaz's telephone being the target for interception. [DE 182: 23].

  Fact: The actual target was Crespo, and the government already had sufficient evidence to arrest Diaz. [DE 182: 23].

- Misrepresentation: FBI and HHS-OIG agents have temporarily postponed pursuing charges against Diaz to coordinate with an investigation targeting Crespo, and Diaz and Agents plan to resume their investigation on Diaz and others in conjunction with the FBI-Miami PC Squad's wire intercepts on Diaz's phone. [DE 182: 23].

  Fact: Special Agent Rolando Alvarez confirmed the closure of the investigation into the Gonzalez DTO. Despite the government's repeated claims to the contrary, evidence supports that the investigation was closed. The arrest of the main doctor of the Gonzalez DTO further supports this conclusion. [DE 182: 23].

- Misrepresentation: ¶ 32: FBI-Miami PC Squad began discussions with SDFL Strike Force agents around April 2019, revealing that Crespo was aware of and involved in planned arrests and search warrants. Crespo knew about the planned arrests of Dr. Gonzalez and others by January 25, 2019, and volunteered to participate. [DE 182: 23].

  Fact:   Crespo was unaware of Gonzalez's impending arrest. The January 25, 2019 e-mail seeking assistance for the arrest did not include the arrestee's name but only mentioned it would be a doctor in Weston. [DE 182: 23].

18

- <u>Misrepresentation</u>: Crespo was aware by January 28, 2019 of the planned search warrant for West Medical by January 28, 2019, and volunteered to participate. [DE 182: 23].

  <u>Fact</u>: The search warrant e-mail also did not identify the clinic's name but only mentioned it was a small clinic office in Hialeah and needed agents on February 7. [DE 182: 23].

- <u>Misrepresentation</u>: Footnote 10: "During June 2019, law enforcement received information…that an individual, who resides in the Dominican Republic, knows CRESPO and that… b) CRESPO's family member is purportedly married to a high-level drug trafficker in the Dominican Republic; and c) CRESPO, during October 2018, forewarned investigative target in the Dominican Republic of an upcoming arrest of airline employees involved in drug trafficking…law enforcement did confirm that CRESPO has previously traveled to the Dominican Republic." [DE 182: 24].

  <u>Fact</u>:  Crespo's visits to the Dominican Republic were natural given he is from the Dominican Republic, and the footnote does not indicate why law enforcement did not investigate this allegation. [DE 182: 24].

- <u>Misrepresentation</u>: ¶ 83 Crespo has not disclosed his relationship with Diaz to his superiors in the HHS-OIG or the SDFL Health Care Fraud Strike Force. [DE 182: 24-25].

  <u>Fact</u>:  Crespo disclosed his relationship with Diaz to HHS-OIG agents multiple times, including an October 2, 2019 phone call to the lead investigative agent informing them about an inquiry from Jorge, a family friend, regarding his investigation status.  Crespo also revealed his relationship with Diaz to another HHS-OIG agent to assist him (Crespo) in investigating Medicare fraud using Diaz's Medicare number. [DE 182: 24-5].

- <u>Misrepresentation</u>: ¶¶ 38 and 39: CS-2 had been cooperating with CS-2 the FBI-Miami PC Squad investigation of  Crespo and other target subjects since April 2019. CS-2 is not a paid informant and is allegedly cooperating as a "good Samaritan." CS-2 "[i]s believed by law enforcement to be reliable." [DE 182: 25].

  <u>Fact</u>: The Government omitted the fact that CS-2 explicitly stated, "[w]ould like

help with his citizenship and would like to be paid but these are [allegedly] secondary to [] doing the right thing." Moreover, in May 2018, CS-2 was deemed to be unreliable and that his information was not based on facts. [DE 182: 25]

- <u>Misrepresentation</u>: ¶ 40: "CS-2 knew CRESPO and that CRESPO was an HHSOIG agent. CS-2 was personally familiar with DIAZ's Oxycodone trafficking activities." [DE 182: 26].

  <u>Fact</u>: In or around April of 2018, CS-2 stated that Crespo was a DEA agent. CS-2 stated that he did not know if Diaz was just bragging or telling the truth regarding Crespo allegedly letting Diaz "[k]now whether he is being investigated or not" and also stated that he did not believe Crespo was corrupt. This is not mentioned in CS-2's March 22, 2019, FBI report. [DE 182: 26]

- <u>Misrepresentation</u>: ¶ 42: "When CS-2 told DIAZ that DIAZ was going to get in trouble, DIAZ told CS-2 not to worry because CRESPO, who DIAZ referred to as 'his friend,' would alert DIAZ if he was being investigated.
  DIAZ also informed CS-2 that CRESPO knew DIAZ bought and sold Oxycodone pills because DIAZ and CRESPO had engaged in direct conversations about DIAZ's drug trafficking activities." [DE 182: 26].

  <u>Fact:</u> CS-2 stated that he did not know if Diaz was just bragging or telling the truth regarding Crespo allegedly letting Diaz "'[k]now whether he is being investigated or not" and also stated that he did not believe Crespo was corrupt. This is not mentioned in CS-2's March 22, 2019, FBI report. [DE 182: 26].

- <u>Misrepresentation</u>: ¶ 43: CS-2 told investigators he witnessed DIAZ and CRESPO in a vehicle together and CS-2 saw another car pulled up next to them and DIAZ sold drugs to an unidentified person. Thereafter, CS-2 approached DIAZ and asked why DIAZ allowed CRESPO, a law enforcement officer, to watch him sell drugs. DIAZ told CS- 2 "not to worry about CRESPO," because CRESPO was DIAZ's friend and that "CRESPO will look the other way." [DE 182: 26].

  <u>Fact</u>: CS-2 stated that he did not know if Diaz was just bragging or telling the truth regarding Crespo allegedly letting Diaz "'[k]now whether he is being investigated or not" and also stated that he did not believe Crespo was corrupt.

This is not mentioned in CS-2's March 22, 2019, FBI 302 report.

It is also important to note that nowhere in the discovery provided by the Government, to date, including the interview reports, does CS-2 state that he saw Crespo in the car with Diaz while Diaz was selling pills. [DE 182: 26]

Such misrepresentations demand judicial review of the wiretap and a hearing on the Motion to Suppress. Discovery demonstrated that much of the information provided by CS-2 regarding Crespo was reported in or around May 2018 – not March 2019, as the government made it seem. [DE 182: 27]. The government's misrepresentations regarding one of its key witnesses, CS-2, in and of itself merited a *Franks* hearing. [DE 182: 27]. The government's improper and unlawful tactics to secure a wiretap of Crespo required suppression of all three wiretap applications and the evidence derived therefrom. None of this was addressed because the district court chose form over substance.

Without the wiretap, the government had no direct evidence. The wiretaps went to the heart of the case and Crespo was denied the right to challenge the wiretaps on a constitutional basis and defend himself because of an unreasonable application of an administrative rule. The court abused its discretion by denying the Motion to Suppress and Request for *Franks* Hearing as untimely.

**II.    THE DISTRICT COURT ERRED BY DENYING THE MOTION FOR MISTRIAL AFTER IMPROPER TESTIMONY PLACING CRESPO WITH DIAZ WHEN DIAZ WAS CONDUCTING OXYCODONE TRAFFICKING AND CAUSING INCURABLE HARM; THE COURT ALSO ERRED BY DENYING MISTRIAL AFTER PROSECUTOR'S BAD FAITH QUESTION IMPLYING THAT CRESPO WAS TOLD BY DIAZ THAT THE BENEFICIARIES WHO WERE GOING TO BE QUESTIONED HAD COVID**

### A.    FALSE TESTIMONY THAT CRESPO WAS PRESENT WHEN DIAZ SOLD DRUGS

The problem here was the repeated solicitation by the government of improper and inadmissible testimony.

The denial of a motion for mistrial based on improper testimony is reviewed for abuse of discretion. In *U.S. v. Harriston*, 329 F.3d 779, 788 (11th Cir. 2003), this Court reversed the district court's denial of mistrial after the prosecutor elicited inadmissible testimony relating to the defendant's prior murder conviction. The district court recognized the "highly prejudicial nature" of the inadmissible testimony but only granted a partial mistrial and gave the jury curative instructions. This Court cited the unusual circumstance of the district court recognizing that serious prejudice had occurred.

The present case is comparable to *Harriston*. Agent Lawless testified about the recorded phone call he had with Crespo on July 20, 2020 in the presence of other individuals from the Public Corruption squad [DE 342: 5; DE 288: Exh. 7-69 (282)], which was the basis of the Count 9 witness tampering charge. Lawless then

improperly testified that he had "prior information" that Crespo was with Diaz when he was buying and selling Oxycodone. [DE 342: 8].

Crespo's defense counsel objected and moved for a mistrial. [DE 342: 9]. The prejudice was that there was no evidence that Crespo was with Diaz when he bought and sold drugs. The impact of telling the jury that a federal agent was present when a drug dealer plied his trade was devastating. It changed the realm and context of the entire case and defense. The testimony incorrectly painted Crespo as a corrupt federal agent looking the other way while Diaz dealt drugs.

Compounding this improper prejudicial testimony was Lawless's testimony from the day before that interviewee Ruben Sotolongo had told Lawless that he had been with Diaz when he sold drugs and that Crespo was present. Defense counsel identified this testimony from the prior day and told the court that he had called the prosecutor because the testimony was wrong and that the prosecutor had agreed with him:

> I called McLaughlin (prosecutor) to complain about it because that is not true based upon what has developed in this case.
>> I said, "We need to correct this,"
> …
>> At that time, we both agreed that that needed to be corrected because Diaz, now, subsequent, flipped and he has been questioned. The government is of the opinion that rendition by Sotolongo that I just described to you is not true because Diaz has said that that never happened, so has the other witness, Anais Lorenzo, who were the closer ones to Crespo in this case.

Now we have that coming up this morning.

[DE 342: 9-10].

To place the error in context, the false testimony about Crespo being present while Diaz was selling drugs occurred *after* defense counsel had spoken to the prosecutor about the false testimony the day before. It is hard to call the errors inadvertent. The prosecutor agreed with defense counsel's recitation and asked for the testimony to be stricken. [DE 342: 10]. The court denied the mistrial but agreed that a limiting instruction was needed because the testimony placing Crespo with Diaz when Diaz was selling drugs was hearsay [DE 342: 17]:

> I do think that something dealing with this pretty
> directly is warranted here **because Crespo's presence during**
> **such a transaction would be pretty damming [SIC] evidence if true.**
> …
> this is something that should be taken care of immediately.

[DE 342: 17-18](emphasis added).

The court's "pretty damming" comment is similar to the court's recognition in *U.S. v. Harriston* that serious prejudice had occurred. 329 F.3d at 786. The defense objected on Sixth Amendment grounds [DE 342: 20], and further objected to the curative instruction as opposed to the court granting a mistrial. [DE 342: 21].

False testimony that Crespo was present at the time Diaz was selling oxycodone created a "substantial influence on the outcome" and there was not

"sufficient evidence uninfected by error support[ing] the verdict." *Harriston*, 329 F.3d at 789. Accusations of drug dealing fall like a bomb when the target is a federal law enforcement officer. The bomb's effect resonates more loudly in a community like Miami, which has suffered from the drug trade for decades and in which law enforcement officers have been corrupted by drug dealers. Such testimony about Crespo was a slur from which he could never recover once the jury heard it. Some errors about what a jury hears are so heinous that no Court instruction could remedy the error. This was such an error.

Twice rung, the bell could not be unrung.

### B.    PROSECUTOR'S BAD FAITH QUESTION IMPLYING CRESPO WAS TOLD BY DIAZ THAT THE BENEFICIARIES WHO WERE GOING TO BE QUESTIONED HAD COVID [DE 348: 127-133]

This Court reviews a preserved claim of prosecutorial misconduct *de novo* because it presents a mixed question of law and fact. *United States v. Moise*, 21-13424, 2022 WL 16579945, at *1 (11th Cir. Nov. 1, 2022). "Improper questions can rise to prosecutorial misconduct." *United States v. Fey*, 89 F.4th 903, 914 (11th Cir. 2023).

This is more than a plain error analysis because the defense objected, was overruled, moved for a mistrial identifying the prosecutor's "bad faith question"

assuming guilt of Crespo, was denied a mistrial, asked for a cautionary instruction to the jury, objected to the sufficiency of cautionary instructions,  asked for the court to tell the jury not to infer anything from the prosecutor's question, and was ultimately only given the curative instruction of "what the attorneys say during the trial is not evidence.. Likewise, their questions are not evidence and you should not consider it as such." [DE 348: 127-133].

During direct examination of HHS-OIG Agent Barranco, the prosecutor asked a foundationless, prejudicial, and bad faith question:

> Q. Did you ask [Crespo] how the source acquired the information as to whether or not these beneficiaries had COVID?
> A. I asked for more details and he didn't provide them.
> …
> **Q. At no time did he ever reveal the fact that it was Jorge Diaz that was the source of this information?**
> A. No.

[DE 348: 127](emphasis added).

This question gave rise to the "reasonable probability that but for the remarks, the outcome of the trial would have been different." *Fey, supra.* The prosecutor made a false implication to the jury that Diaz told Crespo that the beneficiaries who were being questioned as a part of the investigation had COVID – the consequence of which was that the jury was left with the false notion that Crespo was obstructing the investigation by claiming the interviewees had COVID based on information from Diaz who was now a cooperating witness.

Defense trial counsel objected that it was a bad faith, foundationless question [DE 348: 128] arguing "I mean, how more clear can it get that [the prosecutor Mr. Clark] is implying that the information is coming from Jorge Diaz, which is absolutely something that is known to Mr. Clark not to be the case, and he is an experienced lawyer." [DE 348: 130]. The misconduct continued. Over defense objection, which was sustained, but without any corrective jury instruction, the prosecutor asked Barranco "So Agent Crespo effectively thwarted your ongoing investigation by telling you about these COVID beneficiaries?" [DE 349: 15-17].

In *United States v. McClintock*, No. 18-12916, at *8 (11th Cir. Apr. 24, 2019), this Court discussed the Fifth Circuit's holding that despite a curative instruction, a mistrial should have been granted because counsel is prohibited from "(1) expressing a personal opinion about a case, (2) stating facts not in evidence, and (3) making unwarranted inferences." In the present case, the prosecutor did all three: he expressed his opinion and unwarranted inference of Crespo as a "corrupt agent" ten times during closing and rebuttal arguments [DE 349: 153; 155; 157; 160; 162; 164; 185; 237], and invented that Diaz was the inside source Crespo had who told him that the beneficiaries to be interviewed had COVID. *See United States v. Guzman*, 167 F.3d 1350, 1352 (11th Cir. 1999) ("The government may not, however, pose hypothetical questions that assume the guilt of the accused in the very case at bar. "These [guilt-assuming] hypotheticals [strike] at the very heart of the presumption

27

of innocence which is fundamental to Anglo–Saxon concepts of fair trial"") . Crespo's concerns about COVID were real. Barranco testified they "went out in the community only when we had to do essential interviews." [DE 349:13DE 348: 140].

Over defense objection, the prosecutor asked Barranco "But for the fact that Agent Crespo had disclosed to you that he had a source on the street, an old man who said that your benes or the benes who were going to be interviewed had COVID, what would have happened?" [DE 349: 15]; Barranco responded that they would have participated in the interviews with the FBI. The prosecutor's improper questions and resulting testimony prejudiced Crespo's substantial rights and should have resulted in a mistrial.

## III.   THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT ALLOWING RECROSS EXAMINATION OF AGENT SLATTERY

When viewed through the lens of all that Crespo was deprived – where Crespo was prevented from challenging the wiretaps and where Crespo was denied a mistrial after being wrongly accused of drug dealing – the denial of recross examination becomes a pressing and significant issue.

The district court's limiting of cross-examination is reviewed for an abuse of discretion. *United States v. Burke*, 738 F.2d 1225 (11th Cir. 1984). The district court's discretionary authority is limited by "the Confrontation Clause of the Sixth Amendment, which provides that '[i]n all criminal prosecutions, the accused shall

enjoy the right ... to be confronted with the witnesses against him.'" *United States v. Lewis*, 40 F.4th 1229, 1246 (11th Cir. 2022) (internal citations omitted).

Defense counsel was denied recross examination of Agent Slattery. The defense was entitled to explore issues that went beyond his cross, including exhibits he did not know about [DE 343: 24-25], the anonymous letter sent to the DEA [DE 288: Exh. 50D], and that Crespo had "tipped off" Diaz that West Medical was under investigation. [DE 343: 23; 26]. This testimony went to the heart of the prosecution's allegations that Crespo had been corrupted by Diaz. Had recross been allowed, the jury would have been left with a "significantly different impression of the witness's credibility", *see Lewis, supra,* in that they would have learned that Slattery was not basing his testimony that Crespo had "tipped off" Diaz on any substantive evidence. The district court's abuse of discretion requires reversal.

## IV.    THE COURT ERRED BY IMPROPERLY ADMITTING RULE 404(B) EVIDENCE OF UNCHARGED ACTS: THE COURT ERRED BY ALLOWING PREJUDICIAL TESTIMONY BY SLATTERY ABOUT CRESPO'S VIOLATION OF HHS-OIG POLICY BY SELLING PPE FOR COVID

This Court reviews "admission of rule 404(b) prior-bad-acts evidence for a clear abuse of discretion*." United States v. Valdez*, 21-12489, 2023 WL 355091, at *3 (11th Cir. Jan. 23, 2023) (internal citations omitted)).

The court admitted e-mails in which Crespo appears to be buying and selling PPE for COVID protection without approval from HHS-OIG supervisors. [DE 342: 84-85] [DE 288: Exh. 15B7].   Defense counsel objected, citing prejudice and lack for Rule 404(b) notice, and requested the jury be instructed that HHS-OIG policy is administrative, not criminal. [DE 342: 86; 88]. The prosecutor responded that the evidence went to Crespo's state of mind. [DE 342: 86]. Unlike the traditional reasons for admitting Rule 404(b) evidence, "state of mind" is just another way of saying "propensity to commit crimes," which is not a reason to admit such evidence.

In *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978), the Court held that extrinsic evidence of other crimes, wrongs, or acts is inherently prejudicial. Extrinsic evidence "may lead [the jury] to conclude that, having committed a crime of the type charged, [the defendant] is likely to repeat it." *Id*. Which is just what the prosecutor's "state of mind" reason was referring to.

The defense to the charges against Crespo was that Crespo did not have knowledge of Diaz's drug trafficking activities. The defense raised did not require the introduction of Rule 404(b) evidence. The only issue was proof of witness tampering, obstruction, and drug trafficking.

Rule 404(b) admissibility analysis "has three parts: first, the evidence must be relevant to an issue other than the defendant's character. Second, the evidence must be sufficient to support a finding that the defendant actually committed the extrinsic

30

act. Third, the probative value of the evidence must not be substantially outweighed by unfair prejudice." *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1224 (11th Cir. 1993).

All three prongs are at issue here.

<u>First Prong</u>: The evidence of PPE Sales was relevant only to Crespo's character:

The first prong is met where "the state of mind required for the charged and extrinsic offenses is the same." *United States v. Dorsey*, 819 F.2d 1055, 1061 (11th Cir. 1987).

The issues in this case were whether Crespo trafficked Oxycodone, tampered with witnesses, and obstructed justice. Evidence of PPE sales does nothing to answer these questions. The evidence served only to attack Crespo's character, a reoccurring theme of the prosecution's case. It did not address Crespo's state of mind..

<u>Second Prong</u>: The evidence must be sufficient to support a finding that the defendant actually committed the extrinsic act:

Crespo's e-mails were alleged to show buying and selling of PPE without HHS-OIG knowledge.

The full text reveals that Crespo was discussing logistics of PPE sales but not actually confirming purchase or sale, either with or without HHS-OIG approval,

which means the second prong – that there was proof the act had been committed – was not met. [DE 288: Exh. 15B7, entries 9-12].

Third Prong: The probative value of the evidence must not be substantially outweighed by unfair prejudice:

The third prong balances the probative value of the evidence against the danger of it being substantially outweighed by unfair prejudice. *United States v. Sanders*, 668 F.3d 1298, 1314 (11th Cir. 2012). The third prong hinges largely on "the overall similarity…between the charged offense and extrinsic offense." *Dorsey*, 819 F.2d at 1061.

The evidence here served only to make the "if he did it before, he must have done it again" prejudicial propensity argument. The sale of PPE outside administrative rules – which was not even proven – is unrelated to the charges. The probative value was zero while the prejudice was exponential. The district court abused its discretion by allowing the Rule 404(b) testimony.

## V.     CUMULATIVE EFFECT OF ERRORS IN THE DISTRICT COURT WARRANTS REVERSAL AND NEW TRIAL

This Court has "held that the 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible." *United States v. Ramirez*, 426

F.3d 1344, 1353 (11th Cir. 2005). "[A]n aggregation of nonreversible errors ... can yield a denial of the constitutional right to a fair trial." *United States v. Hesser*, 800 F.3d 1310, 1329–30 (11th Cir. 2015) (internal citations omitted).

The aggregation of errors amounts to cumulative error that was not harmless, as "there is a reasonable likelihood that [it] affected the defendant's substantial rights", specifically, his right to a fair trial. *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999).

## A.    THE ERRORS WERE NUMEROUS AND PREJUDICIAL

### 1.    The Court erred by allowing government to play phone call to Anais Lorenzo three times over a Rule 403 objection.

This Court reviews "the district court's admission of evidence over a defendant's objection pursuant to Fed. R. Evid. 403 for abuse of discretion." *U.S. v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006)(internal citations omitted).

> [W]e view the evidence in the light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact…Only if the decision to admit evidence over a Rule 403 challenge is unsupportable when the evidence is viewed in the light most supportive of the decision will we say that the decision constitutes an abuse of discretion.

*Id.*

Exhibit 4-17, a recorded phone call between Diaz and Crespo in which Crespo left an angry voicemail for Anais Lorenzo, telling her and her husband "to come and

knock on my door" and to "stay off the meth" was played in open court for a total of three times. [DE 288: Exh. 4-17, 7-17, p. 68; DE 342: 56; DE 343: 92-93; DE 344: 90].

The second time, defense counsel objected that the tape had already been played and did not go to the charges or elements of the crime. [DE 343: 92]. "Enough is enough of this." [DE 343: 92]. He was overruled, and the call was played a third time during Diaz's testimony. [DE 344: 90].

"The `major function' of Rule 403 `is limited to excluding matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *U.S. v. Lehder-Rivas*, 955 F.2d 1510, 1516 (11th Cir. 1992) (internal citations omitted). Repeating the threatening voicemail recording was a dragging in by the heels of scant probative force for the sake of its prejudicial effect: Crespo came off as an angry and violent person with this repeated recording, which had nothing to do with establishing the charges against Crespo.

> **2.     The Court erred by denying objection to incorrect translation of "I'll make up a story" versus "I'll tell you a story"**

During Diaz's direct examination, the government asked Diaz to interpret the meaning of a transcript of a recorded call:

> Q.     Do you see where Crespo says, "Because they are going to give him your number. They are going to pull the call records. They are going to see my number. Relax, I'll make up a story."
> A.     Yes.

Q.    What did you take that to mean?

A.    And when they pull up my call record, they're going to see his number and he knows what he's got to do, that he called me, and the superman that I used to see lost his cape.

[DE 347: 85].

Defense counsel explained at sidebar that though the translation was provided to the jury as "I'll make up a story", the actual language read "I'll tell you a story," a significant distinction for the facts of the case. [DE 347: 87-88]. The court did not give a curative instruction and the jury was left with the false impression that Crespo had said he would "make up a story" to tell FBI agents when in fact he had said let me "tell you a story".

### 3.    Knife

The government presented Agent Jesus Barranco photographs of a knife during his testimony. [DE 348: 121]. The defense objected, but the following prejudicial colloquy occurred before the jury:

Q.    Agent Barranco, I have handed you what is marked for identification purposes, as Government's Exhibit 64A and B, and ask if you recognize the contents of those photographs?

…

A.    It's a knife.

BY MR. CLARK:

Q.    And was the defendant arrested in possession of a knife by the FBI?

A.    I wasn't present at the arrest but I was informed --

MR. QUINON:    Then I would object, Your Honor.   He has no
personal knowledge.

[DE 348: 121].

Although the images were ultimately not entered into evidence, the prejudicial
effect of the government's leading questions of "the defendant was arrested in
possession of a knife by the FBI?" [DE 348: 121] was significant. The testimony
about the knife continued the attack on Crespo's character using irrelevant facts and
testimony designed to damage Crespo's character in a closely-contested case.

Also prejudicial was the prosecutor's creation of "facts not in evidence",
*McClintock*, No. 18-12916, at *8, during cross examination of defense witness
Henry Luna:

> Q. Added to that is that, based on your experience with him, he was
> quick to anger, was he not?
> A. …I wouldn't say quick to anger.
> Q. Not only would he say things to people, you believed that he was
> prone to violence?
> A. Not prone to violence…

[DE 349: 52-53].

The questions are significant when viewed within the context that the verdict
was irreparably tainted by the court allowing repeated attacks on Crespo's character.
The aggregated errors, including all the other points on appeal listed, were not
harmless and reversal is warranted.

36

## VI.    THE DISTRICT COURT ERRED BY DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL

Al Crespo, a decorated law enforcement agent, was convicted on the word of a shaman who speaks with dead spirits.  [DE 348: 15-20].

This Court reviews "the sufficiency of evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Gatlin*, 90 F.4th 1050, 1059 (11th Cir. 2024). If the record reveals a lack of substantial evidence from which a factfinder could find guilt beyond a reasonable doubt, the conviction must be reversed. *United States v. Harris,* 20 F. 3d 445, 452 (11th Cir. 1994).

### A.    INSUFFICIENT EVIDENCE FOR CONSPIRACY TO COMMIT WITNESS TAMPERING AND WITNESS TAMPERING COUNTS

#### 1.    Count 5 - 18 U.S.C. §§ 1512(b)(3) and (k) Conspiracy to commit witness tampering

18 U.S.C. §§ 1512(b)(3) and (k) read:

§ 1512. Tampering with a witness, victim, or an informant

(b) Whoever **knowingly** uses intimidation, threatens, or **corruptly persuades** another person, or attempts to do so, or engages in **misleading conduct** toward another person, with intent to--

37

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

…
(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C.A. § 1512 (2008)(emphasis added).

In defining "knowingly" and "corruptly persuades" under 18 U.S.C. § 1512, the Supreme Court has stated

"[K]nowledge" and "knowingly" are normally associated with awareness, understanding, or consciousness... **"Corrupt" and "corruptly" are normally associated with wrongful, immoral, depraved, or evil** … Joining these meanings together here makes sense both linguistically and in the statutory scheme. Only persons conscious of wrongdoing can be said to "knowingly ... corruptly persuad[e]."

*Arthur Andersen LLP v. United States*, 544 U.S. 696, 704–08 (2005) (internal citations omitted).

In moving for acquittal, defense counsel argued that the evidence was insufficient to show Crespo "knowingly and willfully joined this particular conspiracy to tamper with witnesses" or that "he acted with the corrupt purpose…or engaged in misleading conduct or that he did knowingly as to any material false

statement." [DE 349: 23-26] (emphasis added). In response, the prosecutor argued that the government had proved that on June 8, 2020, Crespo lied "to Agent Barranco about this purported CI that these benes (beneficiaries) have COVID." [DE 349: 28]. That this is what the government relied on to prove a conspiracy shows the weakness of the prosecution's case. Although the government asked a bad faith, foundationless question about whether Crespo's information about the beneficiaries having COVID came from Diaz [DE 348: 128], this speculation did not show that the threat of COVID was anything but real. As detailed in Point II supra, Crespo's colleagues testified about the strict protocols being followed during COVID [DE 348: 140; DE 349: 13, 35-36] and that the ultimate decision regarding whether the HHS-OIG agents would join in the FBI in conducting the interviews came down to the lack of "adequate PPE to safely conduct the interviews." [DE 288: Exh. 10-K, p.5; DE 348: 118]. The government had not proved that Crespo had lied to Barranco about anything.

## 2.    Insufficient evidence for Witness tampering counts – 18 U.S.C. § 1512(b)(3)

§ 1512. Tampering with a witness, victim, or an informant reads

> **(b)** Whoever knowingly uses intimidation, threatens, or **corruptly persuades** another person, or attempts to do so, or engages in misleading conduct toward another person, **with intent** to--

**(3)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

18 U.S.C. § 1512 (2008)(emphasis added).

As used in § 1512(b), the word "[p]ersuasion is 'corrupt' if it is 'motivated by an improper purpose.'" *United States v. Willkins,* 20-14798, 2022 WL 98748, at *4-5 (11th Cir. Jan. 10, 2022)(internal quotations omitted).

Crespo's defense counsel argued that the government failed to produce evidence that Crespo "**knowingly, corruptly persuaded** another person or knowingly engaged in misleading conduct toward another person" and that there was insufficient evidence to show "**criminal intent** to hinder, delay, prevent the communication of information to a law enforcement officer." [DE 349: 23-26](emphasis added).

The prosecutor responded that Count 7 related to the July 8, 2020 call and "the attempt to shut down the investigation by claiming to have this purported CI when he is having that conversation with Agent Barranco." [DE 349: 30]. As argued in Point II(B) *supra*, the prosecutor created out of thin air the idea that Diaz was the inside source Crespo had who told him that the beneficiaries to be interviewed had COVID – there was no evidence supporting this. Crespo voiced legitimate concerns about COVID that can hardly be considered an attempt to shut down the

investigation. The prosecutor made no mention of the July 15, 2020 e-mail from Lawless stating "we have to cancel all of tomorrow's interviews. I was told HHS agents have been told they can't participate **as they don't have adequate PPE to safely conduct the interviews**." [DE 288: Exh. 10-K, p.5; DE 348: 118]. The e-mail supports Crespo's concerns. How is it possible that Crespo's concerns about COVID are criminal and Lawless's concerns, voiced at the same time, are not? At worst, Crespo's conversation with Barranco and reports of the beneficiaries having COVID delayed HHS-OIG interviews only, as the FBI still conducted the interviews. [DE 348: 119]. At best, Crespo's concerns, which were shared by Lawless, protected his colleagues from illness. More significant is the lack of proof of criminal intent. Two law enforcement officers cannot have the same concerns about COVID at the same time with one being legitimate and one being a corrupt attempt to persuade another.

As for Count 8, the prosecutor cited the July 17, 2020 call where Crespo told Diaz to call Lawless and tell him he did nothing wrong. [DE 349: 241]. Diaz testified that Crespo sounded drunk during the July 17 conversations. [DE 348: 65]. The first relevant conversation took place at 4:27 P.M., by which time Crespo was already drinking five to six bottles of wine for four-and-a-half hours with defense witness Agent Henry Luna. [DE 349: 42; 60].

## B.     COUNT 10 – 18 U.S.C. §§ 1512(C)(2) AND (K) - CONSPIRACY TO OBSTRUCT JUSTICE

18 U.S.C. §§ 1512(c)(2) and (k) read:

> § 1512. Tampering with a witness, victim, or an informant
>
> (c) Whoever corruptly--
> …
>      (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years
> …
> (k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C.A. § 1512 (2008).

In *United States v. Friske*, this Court stated

> To establish a violation of § 1512(c)(2), the government must prove beyond a reasonable doubt that:
>      (1) there was an official proceeding taking place… (2) [defendant] engaged in conduct which constituted a substantial step toward the commission of the crime of obstruction of an official proceeding; (3) [defendant] acted corruptly, i.e., with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the…[proceeding]; and (4) the natural and probable effect of [defendant's] conduct would be the interference with the due administration of justice.

640 F.3d 1288, 1291-92 (11th Cir. 2011) (internal citations omitted).

The Court found that the government was required to prove that the defendant knew of an official proceeding. This involves a nexus limitation. In doing so it cited to *United States v. Aguilar*, 515 U.S. 593, 115 S. Ct. 2357 (1995),

[where] the Supreme Court held that a similar statute, 18 U.S.C. § 1503, which prohibits "corruptly or by threats of force, . . . influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," contains "a `nexus' requirement — that the act must have a relationship in time, causation, or logic with the judicial proceedings." *Id.* at 599. … "[t]he nexus limitation is best understood as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of `corruptly' obstructing." ... In *Aguilar*, the Supreme Court stated that "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct."

*Id.* (internal citations omitted).

This Court in *Friske* joined the sister circuits in concluding that "1512(c)(2) also contains a nexus requirement as articulated in *Aguilar*" and that the *Aguilar*'s principle that "a person lacking knowledge of a pending proceeding necessarily lack[s] the evil intent to obstruct…applies equally to § 1512(c)(2), because without knowledge of the [official] proceeding, [the defendant] could not know that his actions were likely to affect it." *Friske*, 640 F.3d at 1292.

Crespo's defense counsel argued that neither the "knowing" and "willful" joining of the conspiracy was proven nor was the "official proceeding" element proven or that "Crespo was able to foresee or knew of a grand jury proceeding." [DE 349: 23-26].

The government's responded that a grand jury proceeding was foreseeable to Crespo because of the July 17th wiretap where Crespo told Diaz they will pull his

records, which the government considered as confession to the crime, since "the only way you can pull call records is a grand jury subpoena."   [DE 349: 29].

In *United States v. Vaghela*, 169 F.3d 729, 735 (11th Cir. 1999), this Court found the government's evidence fell short of what is required to ground a conviction for conspiracy to obstruct justice because defendants did not foresee further proceedings. The Court stated that

> [a]lthough there had been some FBI investigation…into the payments, there is no indication that the pair had reason to anticipate further proceedings, nor that they viewed their own actions as a way to forestall them. They were simply trying to conceal the evidence of their crime… While Vaghela's efforts to camouflage his own criminal conduct are far from praiseworthy, it would be stretching the language of § 1503 well beyond its intended purpose of "preserving the integrity of a judicial proceeding,"…to allow the act of hiding incriminating evidence to serve as the basis for a conspiracy to obstruct justice.

*Id.* at 735 (internal citations omitted).

Crespo believed the investigation was closed and the evidence supports that it was closed. Crespo's correct belief that the investigation was closed negates all criminal intent. Agent Alvarez told Crespo that the Gonzalez DTO investigation was closed on the October 2, 2019 phone call. [DE 340: 121]. Crespo could not have reasonably suspected there was a grand jury investigation as the prosecutor argued. The arrest of the main doctor of the Gonzalez DTO further supports this conclusion [DE 182: 23], as does Agent Barranco's testimony on cross examination: Barranco testified he was surprised when he got the e-mail from FBI Agent Lawless on June

19, 2020 soliciting help on the Gonzalez DTO because the case had been dormant [DE 348: 143-44], and that there had been a pause for a period of time and by that time Dr. Gonzalez had plead and been sentenced. [DE 348: 142-43]. Rolando Alvarez, the agent doing the Gonzalez DTO investigation, did not tell Barranco that there was a spinoff to the investigation [DE 348: 145; 146] even though Barranco was Alvarez's supervisor. [DE 348: 146].  This further negates the prosecution's argument that Crespo should have reasonably believed there was an ongoing grand jury investigation.

Diaz's testimony showed that Crespo believed the case was over: Crespo was surprised when Diaz told him the FBI interviewed Lucia Alvarez and he told Diaz there were no problems and that the FBI would not interview Alvarez again. [DE 347: 15]. After Anibal Amaro was interviewed a second time, Crespo told Diaz the same thing – that it would only be once that the FBI would interview him, and that they won't come back. [DE 347: 37]. The nexus was not established.

The government presented insufficient evidence and the conspiracy counts should be reversed.

**Importantly, the government's evidence is based on the Title III wiretap calls, which should not have been admitted into evidence in the first place. *See Point I, supra*.**

## VII. THE DISTRICT COURT'S REFUSAL TO GIVE A GOOD FAITH DEFENSE JURY INSTRUCTION WAS AN ABUSE OF DISCRETION AND REVERSIBLE ERROR

The district court denied Crespo's request for a good faith defense instruction, "seriously impairing his ability to present an effective defense." [DE 349: 111; 114]; *United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1212 (11th Cir. 2009).

"A district court's refusal to give a requested jury instruction is reviewed for abuse of discretion, and '[w]e reverse when we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009) (internal citations omitted).

> Refusing to give a proposed "instruction is reversible error only when (1) the proposed instruction is correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense.

*United States v. Balotin*, 3:19-cr-191-MMH-JBT, at *60-66 (M.D. Fla. Feb. 28, 2023)(internal citations omitted).

The three prongs are discussed below. In *United States v. Morris*, 20 F.3d 1111, 1117–18 (11th Cir. 1994), this Court found that the trial court's instruction as a whole "failed to adequately convey the properly asserted good-faith defense on which appellants relied" and that

[a] defendant is "entitled to have the case submitted to the jury in a manner which [will] enable the jury fairly to consider his proffered defenses"…"We have repeatedly held that 'a defendant is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to the theory of his defense.'"

*Id.* (internal citations omitted).

## A.     FIRST PRONG FOR REVERSIBLE ERROR: THE PROPOSED INSTRUCTION IS CORRECT

Crespo's theory of defense was Good Faith: that he "did not act with intent to obstruct and that he acted essentially with intent to assist or help this individual, Diaz, but not with the intent to obstruct in this particular case, and that he, Diaz, was his religious guide and that in that sense, there was a relationship but there was no intent to obstruct, and, therefore, acting in good faith would be a defense." [DE 349: 113-114].

Defense counsel argued, "The jury would have to find, that, in fact, he had no intent to obstruct and that he acted in good faith when he interacted with Mr. Diaz." [DE 349: 113-114]. As such the defense sought the following instruction:

> PROPOSED INSTRUCTION NO. 4
> Good Faith Defense
>
> I instruct you that if the defendant was acting in good faith with regard to the matters addressed in the indictment, then you may consider such evidence because **good faith constitutes a complete defense to each of the charges in the indictment as to the defendant.**
> A defendant acts in good faith where he or she believes that the conduct or statements at issue fall within the scope of the permissible

exercise of their discretion. **Thus, even if the defendant is mistaken about the propriety of his conduct, if such mistake was made in good faith and without intention to violate the law, then the action taken in good faith does not constitute a violation of the statutes charged in this case**.

[DE 245: 11](emphasis added).

Included in the proposed jury instructions were the following citations to case law validating the correctness of using a good faith defense:

> See United States v. Daugerdas, 837 F.3d 212, 229 (2d Cir. 2016) (affirming obstruction and other convictions where district court charged that "good faith is a complete defense to each of the charges in the indictment"); Cheek v. United States, 498 U.S. 192, 203, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (holding that an honest but mistaken, even unreasonable, view of tax laws negates willfulness); Grande Properties Dev., LLC v. JP Morgan Chase Com. Sec. Tr. 2008-C2, No. CIV.A. 10-736, 2011 WL 2669966, at *10 (D.N.J. July 6, 2011)…("A defendant who acts in good faith on an honest, but mistaken, belief that her actions were justified has not breached the covenant of good faith and fair dealing.").

[*Id.*]

The supporting authority shows that the proposed good faith defense instruction was correct in this case, and the first prong was met.

## B.    SECOND PRONG: THE INSTRUCTION WAS NOT ADDRESSED IN THE CHARGE ACTUALLY GIVEN

"[A] theory of the defense instruction is not required 'when the charge given adequately covers the substance of the requested instruction.'" *US Infrastructure, Inc.*, 576 F.3d at 1212 (quoting *United States v. Ndiaye,* 434 F.3d 1270, 1293 (11th

Cir. 2006)). The charge did not adequately cover the substance of the good faith defense instruction in the present case. The relevant jury instructions given defined "knowingly" and "willfully" [DE 271: 9]; "corruptly persuade" [DE 271; 15-17]; and "corruptly" [DE 271: 19], but nowhere did the instructions address that "good faith constitutes a complete defense to each of the charges in the indictment as to the defendant." Or that "even if the defendant is mistaken about the propriety of his conduct, if such mistake was made in good faith and without intention to violate the law, then the action taken in good faith does not constitute a violation of the statutes charged in this case." [DE 245: 11].

The definition of "corruptly persuaded" was insufficient to encompass the good faith defense. Regarding a similarly worded jury instruction on obstruction in violation of §1503, the Supreme Court in Arthur Andersen LLP, 544 U.S. at 704–08 held that where the jury was told

> to convict if it found petitioner intended to "subvert, undermine, or **impede**" governmental factfinding…[n]o longer was any type of "dishonest[y]" necessary to a finding of guilt, and it was enough for petitioner to have simply "impede[d]" the Government's factfinding ability." This same word, "impede", also used in the jury instructions in the present case, "has broader connotations than " 'subvert' " or even " ' [u]ndermine,' … and many of these connotations do not incorporate any "corrupt[ness]" at all.

The Court thus found that "[w]ith regard to such innocent conduct, the 'corruptly' instructions did no limiting work whatsoever." *Id.* The same reasoning applies  in the present case; the given instructions did nothing to indicate to the jury

that the theory of the defense – good faith – was something to be considered in making its life-impacting verdict, "thus denying the appellants the opportunity for the jury to properly consider their only defense to the crime." *United States v. Morris*, 20 F.3d 1111, 1117–18 (11th Cir. 1994).

### C.  THIRD PRONG: THE FAILURE TO GIVE THE REQUESTED INSTRUCTION SERIOUSLY IMPAIRED CRESPO'S ABILITY TO PRESENT AN EFFECTIVE DEFENSE

In *Morris,* this Court reversed the conviction where "the appellants' theory of defense was inadequately conveyed by the instructions delivered." *Morris,* 20 F.3d at 1117. Among the reasons the instructions were found to be inadequate was "the *Cheek* requirement that the good faith of a defendant in this type of case need not be objectively reasonable. This principle represents a notable departure from the more traditional crime, where mistake of the law is no defense. The instruction does not make clear that a good-faith belief by the appellants that they were complying with the tax laws, whether or not objectively reasonable, negates the specific intent element of the crime." *Id.* at 1117-8. The Court concluded that the omission prejudiced the defendants:

> The only element of the crime appellants contest is their specific intent. They assert that, due to a good-faith mistake and belief that they were obeying the tax laws, they lacked the requisite intent. The appellants' entire defense is compromised without an adequate instruction on their good-faith theory of defense.

*Id.* at 1118.

In *Arthur Andersen LLP*, the Supreme Court held that instructions were insufficient where they led the jury to believe that it did not have to find any nexus between persuasion and a particular proceeding:

> A "knowingly ... corrupt[t] persuade[r]" cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material.
> We faced a similar situation in *Aguilar, supra.* Respondent Aguilar lied to a Federal Bureau of Investigation agent in the course of an investigation and was convicted of " 'corruptly endeavor[ing] to influence, obstruct, and impede [a] ... grand jury investigation' " under § 1503…All the Government had shown was that Aguilar had uttered false statements to an investigating agent "who might or might not testify before a grand jury." *...* We held that § 1503 required something more—specifically, a "nexus" between the obstructive act and the proceeding. *...* "[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding," we explained, "he lacks the requisite intent to obstruct."

544 U.S. at 704-8. (Internal citations omitted).

The requested good faith instruction would have clarified for the jury that Crespo was required to have malintent to be found guilty. The defense theory of the case was that Crespo did not act with corrupt intent to obstruct an investigation. [DE 349: 113-114].

### D. THE COURT DENIED ADDITIONAL DEFENSE JURY INSTRUCTIONS.

The defense objected to the court's instruction that regarding employee procedures and Crespo's alleged PPE sales: "I caution you that a violation of these policies and procedures, **standing alone**, is not a crime." [DE 349: 139](emphasis added). Defense counsel argued that this was "vague language". [DE 349: 118; 122].

In the definition of "misleading conduct" the court at first agreed to use the word "material" but then declined to use the word such that it would read "misleading conduct means knowingly making a **materially** false statement." [DE 349: 107]. Defense counsel had previously argued during Rule 29 arguments that "it's our contention that the evidence is insufficient to show that Crespo engaged in misleading conduct or that he did knowingly as to any **material false** statement" and expected the materiality portion to be included in the jury instruction. [DE 349: 24]. Defense counsel's anticipation that the word "material" would be used in the jury instructions –"as the law will be defined to the jury and the law is in this district" [DE 349: 24] – was not fulfilled. The district court abused its discretion by denying inclusion of Crespo's proposed jury instructions.

## VIII.  THE COURT ERRED IN SENTENCING

The standard of review of a sentence is abuse of discretion. *United States v. Riley*, 995 F.3d 1272, 1278 (11th Cir. 2021).

### A.    THE COURT ERRED IN CALCULATING THE DRUG QUANTITY.

Crespo was acquitted of Count One - the drug distribution count. The jury determined that Crespo was not a part of Diaz's drug trafficking. [2] Probation issued Pre-sentence Report (PSR) [DE 313] and two addendums. [DE 313-1; DE 313-2]. In the initial PSR, the drug amount was based on the six patients listed in the indictment yielding an offense level of twenty-six.  [DE 335: 5]. The addendum increased the drug amount to include the entire, uncharged conspiracy with Dr. Gonzalez's clinic, including amounts not trafficked by Diaz. The addendum states

> The offense materials provided by the government…show the defendant's knowledge with respect to the Dr. Gonzalez clinic investigation and the defendant should be held responsible for all conduct relevant to that investigation that was known or reasonably should have been known by the defendant. The probation officer opines that the defendant's conduct in the offense satisfies all the factors outlines in §1B1.3(a)(1)(A) and (B).

[DE 313-1: 5].

---

[2] Effective November 1, 2024, U.S.S.G. 1B1.3 has been amended to exclude acquitted conduct in a federal court, which in this case would apply to Count One. While the court said it was considering acquitted conduct [DE 335: 14], it adopted the findings of the PSR addendum, which did not.

53

### 1. Crespo Protected Diaz. He Did Not Jointly Undertake Any Other Activity With Regard to Dr. Gonzalez

To reach the conclusion stated in the PSR addendum adopted by the court, this Court will have to accept that Crespo should be sentenced for the drug amounts in the Gonzalez uncharged conspiracy. Crespo should be held accountable for all of the drugs in that conspiracy because Crespo tried to obstruct that investigation which is Count Ten of the Indictment. [DE: 349:185]. This is a leap too far, shoehorning all of Gonzalez's conduct into Crespo's guideline calculation despite the fact it was not jointly undertaken with Diaz and/or Crespo.

The commentary to USSG 1B1.3 states that

> The conduct of others that meets all three criteria set forth in subdivisions (i) through (iii) (i.e., "within the scope," "in furtherance," and "reasonably foreseeable") is relevant conduct under this provision. However, when the conduct of others does not meet any one of the criteria set forth in subdivisions (i) through (iii), the conduct is not relevant conduct under this provision.

U.S.S.G. 1B1.3 comment (n. 3).

All of the government's arguments and proof shows *Crespo was trying to protect Diaz*, not Dr. Gonzalez. [See e.g., DE: 349: 172, 174, 175, 178, 182, 183]. There was no privity between Dr. Gonzalez and Crespo. There was no proof that Crespo's conduct was within the scope of all that Dr. Gonzalez was doing. Nor was there proof that in protecting Diaz, what Crespo did was in furtherance of Dr.

Gonzalez's activities, or that any activities by Dr. Gonzalez were reasonably foreseeable by Crespo.

Crespo was working to protect Diaz and no one else. The first PSR calculation was correct- using the drugs directly attributable to Diaz and Crespo's protection of Diaz for the guideline calculations. The use of ***all of the drugs*** in the Gonzalez conspiracy meets none of the §1B1.3 requirements.  The court erred in adopting the PSR addendum's reasoning.

## B.    THE COURT FAILED TO MAKE AN INDIVIDUALIZED FINDING

The court adopted the PSR addendum's reasoning without making any individualized findings concerning the scope of the activity undertaken by Crespo with regard to Dr. Gonzalez's entire criminal activity for which Crespo was held accountable for in the calculation of the drugs for the guidelines. This was clear error. *See United States v. Moran*, 778 F.3d 942, 974 (11th Cir. 2015) ("[T]he district court must first make individualized findings concerning the scope of criminal activity undertaken by the defendant.  Only after the district court makes such individualized findings may it determine reasonable foreseeability").

## CONCLUSION

Alberico Crespo did not receive a fair trial. From the district court's denial on procedural grounds of his Motion to Suppress to rebuttal closing, errors deprived Crespo of substantive rights and require that his conviction be reversed.

Respectfully Submitted,

S/*Philip L. Reizenstein*
Philip L. Reizenstein, Esq.
Reizenstein & Associates, PA
Florida Bar# 634026
2828 Coral Way
Suite 540
Miami, FL, 33145
(305) 444-0755
Phil@Reizensteinlaw.com

## CERTIFICATE OF COMPLIANCE

This document meets the word limit requirements; excluding the parts of the document exempted by FRAP 32(f), this document contains 13,000 words. The Typeface font is Times New Roman 14.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Revised Initial Brief was served via the electronic filing and service system on November 11, 2024.

S/*Philip L. Reizenstein*
Philip L. Reizenstein, Esq.